LAND, J.
Plaintiff sued defendant to recover $4,000 unduly paid. The petition represents that in February, 1904, plaintiff bought, through defendant, 400 bales of cotton futures, and had to his credit on the books of defendant $9,600; that he instructed defendant that he would not stand, at any time, any loss beyond the margin to his credit; and that he “must hedge when margin about exhausted.”
The petition further represents that of the amount which petitioner had to his credit he drew down $6,000, leaving a balance of margins to his credit of $3,600, and that defendant, contrary to his instructions, allowed cotton to go down until the entire margin was exhausted and $4,000 in addition.
The petition further represents that for said sum of $4,000 defendant drew a sight draft, which was paid by the Citizens’ Bank of Meridian, Miss., under previous general instructions, before plaintiff received the telegram from defendant advising him of the sale of the cotton.
The petition further alleges that defendant was bound to save him from any loss beyond his margin, and that the said draft was paid in error, and no part thereof was due to-defendant.
Wherefore the plaintiff prayed for judgment for $4,000, with interest from judicial: demand and costs.
Defendant for answer, after pleading the-general issue, admits the purchase of the cotton as alleged in the petition, and that on or about February 9, 1904, plaintiff had to-his credit on defendant’s books about $9,600, being the aggregate amount of sums deposited from time to time for margins. The answer specially denies that plaintiff ever instructed' defendant “that he would not stand at any time’any loss beyond the margin to his credit, and that they must hedge when margin was about exhausted,” and avers that on or about February 9, 1904, plaintiff stated that he could not afford to lose any more than the amount then to his credit, to wit, $9,600, and instructed defendant to hedge when said margin was exhausted. The answer admits that subsequently, the market having gone up, plaintiff “drew down” $6,000, leaving a balance of margin of $3,600. The answer avers-that on March 18, 1904, there was a great panic in the cotton market, the price suddenly dropping over 200 points, and that defendant, fearing that the market would go much lower- and not being able to communicate with plaintiff, sold 400 bales of May at 13.35 cents in order to prevent a greater loss, which at the time appeared to be inevitable. The answer-admits the drawing and payment of the draft for $4,000 as alleged. Defendants annexed to the answer an account current, -showing a balance of $195 in favor of plaintiff after crediting him with the proceeds of said draft, for $4,000, which balance defendants averred they were ready and willing to pay.
Defendants tendered to plaintiff the sum-of $204.15 to cover said balance and costs, and on his refusal to accept the same deposited the amount in the registry of the court-subject to the order of plaintiff.
*24 There was judgment for plaintiff as prayed for, and the defendant has appealed.
The crucial question is as to the instructions given to defendant on the eve of the departure of plaintiff from the city of New Orleans in February, 1904, after the 400 bales of cotton had been purchased and all the margins had been put up. The following memorandum of the understanding was written at the time on the “trading sheet” by Mr. Frank A. Longshore, to wit: “Hedge when margin about exhausted.”
Plaintiff was present and both parties accepted the memorandum as correctly embodying the instructions given. Both were permitted to testify as to their respective understandings' of the instructions, and as usual in such cases they differ widely. Plaintiff was leaving for his home in Alabama, situated 15 miles from the nearest telegraphic station and 3 miles from the nearest post office. Before leaving he gave instructions to guide his brokers in the conduct of the business intrusted to their care. These instructions were general, and were intended to continue until changed or modified. Cotton subsequently rose in price to such a degree as to render a margin of $9,600 unnecessary, and on February 26th, defendant wired $4,000 to plaintiff, and on March 7th paid his sight draft for $2,000. These payments reduced the margins to about $3,600. No new instructions were given or requested. On March 18th there was a “slump” of over 200 points in the cotton market in New Orleans, and the defendant “hedged” by purchasing 400 bales for plaintiff. The loss resulting from the. ■transactions amounted to $7,600, leaving a deficit of $4,000 after absorbing all the margins to plaintiff’s credit. Defendant drew on plaintiff’s bank for $4,000, and the draft was paid under general previous instructions from ■plaintiff. On March 18th the defendant wired and wrote to plaintiff, but there is nothing in the record to contradict the testimony of plaintiff that he did not receive the telegram or letter until after the draft was paid.
The case turns on the construction to be given to the memorandum already recited. Plaintiff’s contention is that the “margin” referred to was any margin that might be to his credit at any time.
Defendants’ contention is that the “margin" intended was the particular sum to the credit of plaintiff at the date the instructions were given. Under this construction the margin contemplated was the fixed amount of $9,600, to be held by the brokers until the transaction was closed. That such was not the common understanding is shown by the fact that as soon as there was a rise in the price of cotton plaintiff “drew down” $4,000, and at a subsequent date “drew down” $2,000 more. These sums, thus withdrawn, ceased to form a part of the margins, and there remained only a balance of $3,600 to be “exhausted” in the fluctuations of the cotton market. Defendant “hedged” when the loss was $7,600, while according to his own theory he was not to do so until the loss approximated $9,600.
“Margin,” as a brokerage term, signifies “a sum of money, or its value in securities, deposited with a broker to protect him against loss in buying or selling for his principal.” Standard Diet, verbo.
It has no application to sums of money withdrawn from the hands of a broker and which have ceased to be at his disposal.
Of course, the term “margin” covered the balance then in the hands of the defendant to the credit of the plaintiff; but it also covered all future balances. We must presume that the term was used in its ordinary meaning to designate any sum of money in the hands of the broker at any stage of the transaction. Plaintiff was forced by a falling market to put up margins to the extent of $24 per bale. Did he agree to leave this extraordinary margin in the hands of his brokers until the termination of the four deals which he had made?
The theory of the defense assumes that plaintiff made such an agreement. There is *26 no direct evidence to this effect, but one of the brokers testified that plaintiff said that when the $9,600 was exhausted to hedge the trades, and that he could not afford to lose any more.
The withdrawal of $6,000 subsequently changed the situation so as to make the asserted instructions applicable only to the sum of $3,600 left in the hands of the brokers. Plaintiff contradicts the testimony of the broker, and this conflict of evidence leaves the memorandum of agreement to be construed in accordance with the ordinary meaning of the words used, the nature of the business, and the conduct of the parties. Thus construed, the instructions referred to any margin, at any time, in the hands of the broker.
The question is one of fact, and, to say the least of it, the judgment of the district court is not manifestly or clearly wrong in the light of the evidence.
Judgment affirmed.