(85 South. 63)

No. 22767.

### ESTES v. GARRISON et al.

(May 31, 1920.)

*(Syllabus by Editorial Staff.)*

1. **Brokers** ⬳24(2)—**Evidence held to prove broker's agreement to close out trade on exhausting margin.**

In grain broker's action for loss sustained in trading in wheat for defendants, evidence *held* to show that there was a positive agreement between broker and such defendants that the trade for defendants would be closed out when the margin to defendant's credit should be exhausted.

2. **Customs and usages** ⬳19(3) — **Evidence held to prove custom requiring broker to close out trade on exhausting margin.**

In grain broker's action to recover loss sustained in trading in wheat for defendants in excess of the margin in broker's hands to defendants' credit, evidence *held* to prove a general custom prevailing in the grain trade whereby broker should have closed out trade for defendants on exhausting their margin.

3. **Brokers** ⬳24(2) — **Could not recover for loss in trading in wheat after customers' margin exhausted.**

Where grain broker continued to trade in wheat for particular customers after the margin to the credit of such customers in broker's hands was exhausted, in violation of a specific agreement and a general custom in the grain trade to close out the trade on margin being exhausted, broker could not recover the loss sustained.

Appeal from First Judicial District Court, Parish of Caddo; J. R. Land, Judge.

Action by W. Collier Estes against J. H. Garrison and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Herndon & Herndon, of Shreveport, for appellant.

Blanchard, Goldstein & Walker, of Shreveport, for appellees.

SOMMERVILLE, J. Plaintiff, a futures broker in the city of Shreveport, bought on the order of defendants, J. H. Garrison & Son, of Garrison, Tex., 20,000 bushels of May wheat on February 9, 1916, at $1.30, and he sold the wheat on February 29, 1916, 10,000 bushels at $1.10¾, and 10,000 at $1.10⅝ cents, the loss being $3,297.50, for which amount plaintiff sued defendants.

Defendants answered, averring that it was agreed and understood between the plaintiff and defendants at the time of the purchase referred to that they (defendants) had a margin to their credit with the plaintiff, with

whom they had been doing business for some years, and that any loss that was sustained beyond the amount of that margin was due entirely to the failure of plaintiff to throw out the trade of the defendants when their margin became exhausted; that it was agreed between plaintiff and defendants that the latter would be closed out whenever the margin in plaintiff's lands was exhausted; and that it was a general custom prevailing in the trade for plaintiff to have thus acted. Reconvening, defendants asked for damages for the wrongful issuance of the attachment in the case.

There was judgment in favor of defendants, rejecting the demand of plaintiff.

[1, 2] The defendants have, by a preponderance of evidence, sustained their defense to the effect that there was a positive agreement between plaintiff and themselves that, when the margin of $600 then in the hands of plaintiff should be exhausted, the trade would be closed out. And the evidence showed not only was there an agreement to such effect between the parties, but that the general custom prevailing in the cotton and grain trade in Shreveport would have required plaintiff to have so acted, and not to have held the grain on a falling market until the loss amounted to $3,000.

W. Y. Garrison, one of the defendants, testified:

"Upon Mr. Estes' first visit to Garrison, about 2½ years ago, before I began dealing with him regularly, I asked him the question: 'Would you carry me in case I am out of town and want my deals carried on?' And he said that he would not, nor any other man, and told me that a man who was not able to keep a margin with him would be an undesirable customer; and I agreed with him. And I told him right then that if I did not keep money there with him for him to close me out." "I instructed him to close my contract when my margin was exhausted." "Q. What did he tell you, if anything, that he would do when your margin became exhausted? A. That they would close me out."

This testimony is denied by plaintiff, who testified that there was absolutely no agreement with the defendants at the time he started trading with them, or at any subsequent time. Yet in the case of Wood v. Reeves, No. 16614 on the docket of the district court, which testimony was offered in evidence in this cause, plaintiff testified as follows:

"Q. Mr. Estes, what is the custom among brokers about closing out a contract as soon as the margins are exhausted? A. They close them out when they have no more money there; when they have no more money there they close them out. Q. Is that the custom that is observed generally in Shreveport? A. Yes, sir; observed everywhere. Q. Mr. Estes, I will ask you, if a trader or one came to you in the absence of any agreement to the contrary, would he have the right to expect that you would close out the contract as soon as his margins were exhausted? A. I do not know what he would expect; I know I would close him out. Q. You would close him out? A. Yes, sir.. Q. Now, Mr. Estes, suppose that the market was very active, and that on the day before the margins were exhausted the market would reach a point within 10 points of the exhaustion of the margin; what would you do in that case? A. I would close him out. I would not carry him over within 20 points. I might carry him over within 10 points on a sluggish market. * * * Q. Now, in this case it is urged that the fact that the defendant was in another place, on another cotton exchange, and from that place dealt with the broker in New Orleans, on the same contract you had with him, would that fact prevent you looking after his contract? A. I would not care where he was, I would close him out, if he did not have any more money there. * * * Q. Mr. Estes, suppose that you had a customer that had been dealing with you for some time, and always made good all his losses; state whether or not, if he were out of town, you would give him an opportunity to advance additional margins, in order to hold the market, if you could get hold of him by wire? A. I would close him out when the margins were exhausted. Q. If the margins were not exhausted, still had several points, and you could get him by wire, would you wire for additional margins? A. Yes, sir: I would do my utmost to let him know the state of the market, but I would not take any risk myself."

Mr. Billieu, who was plaintiff's chief clerk for some eight or nine years, and in charge of his business at that time, testified that his instructions from plaintiff as to defendants or any other customer were to close out the trade of the customer whenever the customer's margin became exhausted. Again he testified:

"Q. If his margin is exhausted, you ring him up, and if you cannot get hold of him you close him out? A. Yes, sir; if you let him go beyond his margin, you are not a broker; you are a banker. Q. You are giving him credit, are you not? A. Yes, sir; but you are doing it on your own responsibility unless he has instructed you to do so."

Billieu's testimony is corroborated by that of Nelson, a witness for plaintiff.

Plaintiff is contradicted by his own testimony in the Wood case, by his former clerk, Billieu, by Nelson, his own witness, and by W. Y. Garrison, one of the defendants in this case. It is established by a preponderance of evidence that it was the duty of plaintiff to have closed out the trade of defendant upon exhaustion of defendants' margin, not only by reason of the custom of the trade, but also by virtue of an express agreement between plaintiff and defendants.

Plaintiff in argument asks for judgment against defendant because of a draft for $1,-450 which was paid to defendant on February 22, 1917, by Thorn & Maginnis on some cotton transaction. But no claim therefor is made in the pleadings. Testimony was offered with reference thereto, but it was objected to, and the objection was sustained, although it is found in the record. This has reference to future transactions in cotton which were handled by Thorn & Maginnis for the plaintiff, as representative of defendants Garrison & Son. Plaintiff was the broker; but the transactions were all directly between Garrison & Son and Thorn & Maginnis, of the New Orleans Cotton Exchange; while the future transactions in grain were through agents on the Chicago Board of Trade. The two matters have no connection one with the other.

Plaintiff's suit is one for the amount of loss on a grain contract; and the evidence shows that the loss was sustained by plaintiff through his own fault and neglect; and defendants are not responsible therefor.

[3] The question is one of fact; and the judgment of the district court is clearly right in the light of the evidence. It was held in a somewhat similar case, where a broker was instructed to "hedge when margin about exhausted," and the broker failed to follow instructions, that he was liable for the loss. Winston v. Longshore, 116 La. 21, 40 South. 517.

The judgment appealed from is affirmed.